## WEBER ELECTRIC CO. v. E. H. FREEMAN ELECTRIC CO.

(District Court, D. New Jersey. November 6, 1918.)

1. PATENTS ☜328—VALIDITY—INFRINGEMENT—"TELESCOPE."

The Weber patent, No. 743,206, claims 1 and 4, for an incandescent electric lamp socket, consisting of the combination of a pair of members comprising a sleeve, etc., and a cap adapted to telescopically receive the end of the sleeve, etc., *held* valid, and infringed by defendant's device, which provided for rotation; for the word "telescope" means to drive together, so one slides into another like a spyglass, and often rotative movements are necessary to close a spyglass.

2. PATENTS ☜328—VALIDITY—INFRINGEMENT.

The Weber patent, No. 743,206, claims 2 and 3, for an incandescent electric lamp socket, *held* invalid and anticipated, and hence not infringed.

In Equity. Suit for infringement of patent for improvement in incandescent electric lamp sockets by the Weber Electric Company against the E. H. Freeman Electric Company. Decree for complainant.

Frank C. Curtis, of Troy, N. Y., for complainant.

Robert H. Parkinson, of Chicago, Ill. (David P. Wolhaupter, of Washington, D. C., of counsel), for defendant.

DAVIS, District Judge. [1] This suit was instituted for the infringement of United States patent No. 743,206, issued to August Weber, Sr., November 3, 1903, and by him assigned to the complainant. The patent has five claims, the first four only of which are alleged to have been infringed by the defendant, and are as follows:

"1. In a device of the class described, the combination with a pair of members comprising a sheet-metal sleeve having a slotted end and introverted tongues, and a cap adapted to telescopically receive the slotted end of said sleeve, said members having interengaging parts adapted to automatically interlock with a snap action when telescopically applied to each other, and to be released by compression of said sleeve, of an insulating base for electrical fittings loosely inclosed within said sleeve in engagement with said tongues, substantially as described.

"2. In a device of the class described, the combination with a base of insulating material having a peripheral recess, and an incandescent lamp support mounted thereon, of an inclosing case therefor comprising in part a sheet-metal sleeve having a portion of its wall introverted to occupy said base recess, substantially as described.

"3. In a device of the class described, the combination with a base of insulating material having a peripheral recess, and a screw socket fixedly mounted thereon, of an inclosing case therefor comprising in part a sheet-metal sleeve having a portion of its wall introverted to occupy said base recess, and prevent a relative rotative movement between said sleeve, base, and socket, substantially as described.

"4. In a device of the class described, and in combination a pair of members comprising a sheet-metal sleeve having a slotted end, and a sheet-metal cap adapted to telescopically receive the slotted end of said sleeve, one of said members being provided with a recess, and the other having a correspondingly located transverse slit, and the wall on one side thereof displaced to form a projection beveled or inclined toward said recessed member and terminating abruptly at said slit, whereby said members are adapted to automatically interlock with a snap action when telescopically applied to each

---

☜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

other, and to be released by manual compression of said slotted sleeve, substantially as described."

As Judge Ray, in the case of Weber Electric Co. v. National Gas & Electric Fixture Co. (D. C.) 204 Fed. 79, said:

"Claim 1 calls for a pair of members comprising (1) a sheet-metal sleeve having a slotted end and introverted tongues and (2) a cap adapted to telescopically receive the slotted end of said sleeve, said members having interengaging parts adapted to automatically interlock with a snap action when telescopically applied to each other, and to be released by compression of said sleeve; also in combination an insulating base for electrical fittings loosely inclosed within said sleeve in engagement with said tongues, all substantially as described.

"Claim 2 calls for (1) a base of insulating material having a peripheral recess; (2) an incandescent lamp support mounted thereon; and (3) an inclosing case therefor comprising, in part, a sheet-metal sleeve having a portion of its wall introverted to occupy said base recess, all substantially as described.

"Claim 3 calls for (1) the same base as claim 1; (2) a screw socket fixedly mounted thereon; and (3) an inclosing case therefor comprising in part a sheet-metal sleeve having a portion of its wall introverted to occupy said peripheral recess of the base and prevent a relative rotative movement between said sleeve, base, and socket, all substantially as described.

"Claim 4 calls for a pair of members comprising a sheet-metal sleeve having a slotted end and a sheet-metal cap to telescopically receive the slotted end of said sleeve, one of said members being provided with a recess, and 'the other having a correspondingly located transverse slit and the wall on one side thereof displaced to form a projection beveled or inclined toward said recessed member and terminating abruptly at said slit, whereby said members are adapted to automatically interlock with a snap action when telescopically applied to each other and to be released by manual compression of said slotted sleeve, all substantially as described."

The patent in question has been decreed to be valid in the Southern district of New York, in the case of Weber Electric Co. v. National Gas & Electric Fixture Co., supra, and affirmed by the Circuit Court of Appeals of the Second Circuit in 212 Fed. 948, 129 C. C. A. 468; in the district of Massachusetts in the case of Weber Electric Co. v. Wirt Manufacturing Co., 226 Fed. 481; and in the district of New Jersey, in the case of Weber Electric Co. v. Union Electric Co., 226 Fed. 482.

Judge Ray, in the Southern district of New York, fully considered the Fowler patent, the Bray patent, the Oetting patent, the Kenney patents, and the Paiste patent, cited here against the validity of the Weber patent, and found the Weber patent to be valid. Judge Rellstab, of this court, re-examined the said patents, together with the Wirt patent, and reached the same conclusion. In addition to these patents, the defendant here relies upon the Benjamin patent, the Mix and Genest patent, the Knowles patent, the Edison & Swan patent, and the Gover patent. I find myself absolutely in accord with Judges Rellstab, Ray, and Dodge as to the validity of the Weber patent as affected by the prior art in the patents cited and considered by them; and in the patents cited in this case, which were not cited and were not considered in the previous cases, there is nothing, in my opinion, which affects their decision as to the validity of claims 1 and 4.

The essence and genius of the Weber patent consist in certain de-

vices, interengaging parts, on the case members which automatically interlock with a snap action when the said case members are telescopically assembled. Weber in the specification says:

"The principal object of my invention is to provide a simple and effective automatically locking connection between the sleeve and cap of an incandescent electric lamp socket.

"My invention is applicable to various telescopically connecting members, but is especially adapted for use in the telescopically connecting cap and sleeve members of incandescent electric lamp sockets.

"In carrying out the principal feature of the invention, the inner telescoping member is made compressible, and the telescopically connecting members are provided, in the manner hereinafter described, with interengaging parts adapted to automatically interlock with a snap action when telescopically applied to each other, and to be released by compression of said inner member."

The immediate use and success of the patent embracing these principal objects are evidence of its invention, and of its superiority over anything in the prior art at that time. As Judge Rellstab said:

"Weber's structure did not enter an art already well filled with devices accomplishing like results. His conception carried him well in advance of any competitor in that field, at the date of his invention, and the mechanism embodying his conception has largely displaced other makes of electric lamp socket casings."

Judge Ray said in the National Gas Case, supra:

"It cannot, under the evidence in these cases, be successfully disputed that these structures have largely displaced those of the prior art. They present new and novel features in this art, have proved a commercial success, and are less expensive in construction and also safer. They are easier of assembling. Substantially all the sockets now on the market have a snap-shell construction, and the evidence establishes that at least 85 per cent. of such sockets are made by the Webers and their licensees."

Defendant's keyless socket, as does the Weber keyless socket under claim 1, calls for a pair of members comprising (1) a sheet-metal sleeve having a slotted end and introverted tongues and (2) a cap adapted to telescopically receive the slotted end of said sleeve; said members having interengaging parts adapted to automatically interlock with a snap action when applied to each other, and to be released by compression of said sleeve; also in combination an insulating base for electrical fittings loosely inclosed within said sleeve in engagement with said tongues. Defendant's key socket is like the keyless in all respects, except the key renders an introverted tongue unnecessary. There is no doubt that in these respects the sockets of the defendant conform to the requirements of claim 1 of Weber.

The defendant's sockets, both the key and keyless, have a pair of members comprising a sheet-metal sleeve having a slotted end and a sheet-metal cap to telescopically receive the slotted end of said sleeve; one of said members, the sleeve, being provided with recesses, and the other, the cap, with corresponding projections or studs, which are mechanical equivalents of the projections in the Weber, whereby said members are adapted to automatically interlock when applied to each other telescopically with a slight rotative movement, and to be released by manual compression of said slotted sleeve. The bevel is

not on the projection, as in Weber, but is on the corner, or right angle, formed by the periphery and slot of the sleeve adjacent to the recess or hole adapted to receive one of the studs, its interengaging part, of the cap. The studs are mechanical equivalents of the projections and the hole and slots of the recesses in the Weber patent. There are four studs on the inner side of the cap in the defendant's socket. There are also four recesses into which these projections enter; one of them is the hole already referred to; the other three are open-end slots which receive the corresponding studs upon the cap, and which automatically interlock with a snap action when the two are applied to each other telescopically with a slight rotative movement. It makes no difference, as Judge Ray pointed out, whether these corresponding interengaging parts, projections and recesses, are upon the sleeve member or the cap member of the casing.

Defendant, however, contends that it does not infringe, because claims 1 and 4 of Weber provide that these interengaging parts automatically interlock with a snap action when the case members are telescopically applied to each other, whereas the defendant's sockets require a rotary motion, in addition to the telescopic, in order to interlock. This, it is claimed, distinguishes the operation of the defendant's sockets from the provisions of the Weber patent. This distinction is justified, the defendant contends, by the statement of Judge Rellstab in the Union Electric Co. Case, supra, that:

"In Kenney (U. S.), the shell was provided with open-end slots and slots adjacent thereto. Radial inwardly projecting studs on the cap were adapted to enter these open-end slots in the shell, and then by a rotary movement, after the telescopic application was completed, to spring into the adjacent slots. In combination with these slots and studs, the shell was provided with bayonet slots, intermediate of the others referred to, and the cap was provided with additional radial projections, intermediate of the studs referred to, which entered recesses within the periphery of the socket base or insulator block to lock the same in position. No interlocking of the Kenney members could be effected automatically by telescopic pressure. A rotary movement of the members against each other was absolutely necessary to put the radial projections and the intermediate lugs into position to effect a locking engagement."

Judge Rellstab, in the above quotation, was describing the Kenney patent, and particularly its method of operation. Whether or not under the particular facts of this case this additional rotary movement, or the telescopic movement with a rotary component, would be sufficient to differentiate the patents, so that the defendant may escape the charge of infringement, is another matter, and is not justified as a conclusion from Judge Rellstab's description of the Kenney patent. There were other essential differences distinguishing the Weber patent from the Kenney, one of which was the abruptness of the termination of the projections which make the interlocking firm and secure as compared with the abruptness of Kenney's studs G, and which have no abrupt termination, but which abruptness the interengaging parts on defendant's sockets have. Weber, however, did not specifically confine his claim to a construction the parts of which must be assembled by a straight, direct, telescopic movement. In fact, in his patent No. 743,206, without the guard or guide contained in later patents, it is dif-

ficult to bring together the case members with such accuracy as to make a slight rotative movement unnecessary before the interlocking takes place. In order to sustain the contention of the defendant, a telescopic application of the case members to each other must be made with such accuracy as to prevent the slightest rotative movement before the interlocking of the interengaging parts. While Weber did not in terms thus limit the movement, yet the defendant contends that the use of the words "telescopically applied to each other" necessarily imposes such limitation and excludes the slightest rotative movement before interlocking is effected. The verb "telescope," according to the Standard Dictionary, means:

"To drive together, so that one slides into another like the sections of a spyglass or small telescope; to crush by driving together into or upon; to move like the sliding portions of a spyglass in closing."

Often slight rotative movements are necessarily employed in bringing together sections of a spyglass. The limitation here contended for, therefore, is not necessarily imposed or implied in the words used by Weber, nor by experience in actually doing the thing, and Weber did not in terms so limit the movement. In any case, the term "telescopically" should not be so limited, for by so doing justice would seem to be defeated.

The defendant has appropriated all the elements of claims 1 and 4 of the Weber patent, enjoyed the fruits thereof, and seeks to escape the consequences of such appropriation by the single studied distinction of a slight rotative movement in bringing together the cap and sleeve. This, in my opinion, cannot be done, and the defendant is guilty of infringement of said two claims.

[2] If claims 2 and 3 are valid, defendant has likewise infringed these claims. Their validity seems to me to depend upon whether or not the introverted portion of the wall of the sheet-metal sleeve is limited to a cut edge tongue as exhibited in 15 of Figure 2 of the Weber patent. If so limited, claims 2 and 3 are valid and are infringed. If not so limited, and if an indentation in the wall portion of the sleeve accomplishes the same thing as the introverted tongue called for by claim 1, preventing the rotation between the insulating base and the sleeve, then such indentations are mechanical equivalents of introverted tongues.

The evident purpose of the introverted tongues mentioned in claim 1 and introverted portions of the wall of the sleeve mentioned in claims 2 and 3 is to prevent rotation between the insulating base and the sleeve. The introverted tongues and the introverted portions of the wall of the sleeve are different things; but they accomplish the same thing in the same way, and are mechanical equivalents. The introverted tongue 15 in Fig. 2 of Weber is the tongue referred to in claim 1. The change of language in claims 2 and 3, from "introverted tongues" to "a portion of its wall introverted," was doubtless made to cover any indentation of the wall of the sleeve adapted to enter the recess in the insulating base to prevent rotation between it and the sleeve. It seems to me, therefore, that the introverted portion of the wall cannot be limited to sharp edge, cut-metal introverted tongues called for by claim 1.

In the Benjamin patent, No. 575,322, January 19, 1897, we have a base of insulating material having a peripheral recess, etc. In fact, we admittedly have every requirement of claims 2 and 3, except the introverted portions of the wall of the sleeve, and as to these the patent describes them thus:

"Upon the interior of the shell or casing $e$ two lugs or projections $e^2$ $e^2$ are provided, which engage corresponding recesses $a^9$ $a^9$ in the base $a$ to prevent rotation of the base relatively to the casing."

In the Benjamin patent, however, the indentations or inward projections are on the cap, and not on the sleeve, as in Weber. It makes no difference on which of the case members the lug or projection is located, for the purpose and effect is identical, whether in one member of the casing or the other. The introversion of the casing into engagement with a recess in the base has no different function, mode of operation, or effect in the Weber socket than in the Benjamin socket and the defendant's sockets.

In the Edison & Swan patent of May 4, 1895:

"The base $A$ is grooved along each side, and the casing $O$ which holds it has its two opposite sides indented as shown at $H$, so that the base $A$ and the parts fixed on it are made to occupy the proper position relatively to the bayonet catch slot $K$ by which the lamp base is held in the socket."

These indentations in the casing, which project into recesses in the base $A$, are shown by top view in Fig. 2, where they are marked $H$ and accomplish the same thing in the same way as the introverted portions of the wall of the sleeve in the Weber patent.

The Gover patent, 1897, shows and describes indentations in the wall of the casing engaging with corresponding grooves in the periphery of the insulating base, to prevent rotation between it and the casing. "The two sides of the socket are indented so as to form internal protuberances $p$, engaging in the grooves $i$ of the insulator to prevent it from turning." This serves the same purpose as the introverted portions of the wall of the casing in the Weber patent.

These patents admittedly conform to claims 2 and 3 of Weber in all essential respects, except the introverted portions of the wall of the casing, and if it is true, as I hold, that that is not limited to a cut-metal edge tongue, they substantially agree in this respect.

I have not considered the Epstein patent, the Mix and Genest patent, the Perkins patent, and the Marshall patents, because they are all subsequent to the date of the invention of Weber, as found by Judge Ray, with whose conclusions I agree.

It follows that claims 2 and 3 are invalid and not infringed, and that claims 1 and 4 of Weber are valid and infringed, and on those two claims, 1 and 4, the plaintiff is entitled to an injunction and damages and profits.