E. H. FREEMAN ELECTRIC CO. v. WEBER ELECTRIC CO.*

WEBER ELECTRIC CO. v. E. H. FREEMAN ELECTRIC CO.

(Circuit Court of Appeals, Third Circuit. August 13, 1919. Rehearing Denied December 13, 1919.)

Nos. 2440, 2441.

PATENTS ⬦328—VALIDITY AND INFRINGEMENT—ELECTRIC LAMP SOCKET.
The Weber patent, No. 743,206, for an incandescent electric lamp socket, claims 2 and 3, *held* void for lack of patentable novelty. Claims 1 and 4, as limited by their language, the proceedings in the Patent Office, and the prior art, *held* not infringed.

Appeal from the District Court of the United States for the District of New Jersey; J. Warren Davis, Judge.

Suit in equity by the Weber Electric Company against the E. H. Freeman Electric Company. From the decree, both parties appeal. Affirmed in part, and reversed in part.

For opinion below, see 253 Fed. 657.

Frank C. Curtis, of Troy, N. Y., for plaintiff.

Robert H. Parkinson, of Chicago, Ill., Livingston Gifford, of New York City, and David P. Wolhaupter, of Washington, D. C., for defendant.

Before BUFFINGTON and WOOLLEY, Circuit Judges, and MORRIS, District Judge.

MORRIS, District Judge. Weber Electric Company, the plaintiff, filed its bill in equity against E. H. Freeman Electric Company, charging infringement of United States letters patent No. 743,206, for improvements in incandescent electric lamp sockets, granted to August Weber, Sr., November 3, 1903, and by him assigned to the plaintiff. The claims in issue were 1 to 4, inclusive. From a decree adjudging claims 1 and 4 valid and infringed, and claims 2 and 3 invalid, both parties appealed.

The incandescent electric lamp socket, to which Weber's patent relates, is a sheet metal case consisting of a sleeve and a cap telescopically fitting over the end of the sleeve. The case thus formed incloses an insulating base with which the line wires entering through a central aperture in the cap are connected, and upon which is affixed a screw socket for receiving the screw-threaded shank of an incandescent lamp. The patent deals principally with interlocking means between the sleeve and cap, and with means to prevent rotative movement between sleeve and base when a lamp is being inserted in or removed from the screw socket affixed to the base. The claims in issue are set out at length, and plaintiff's structure described, in the opinion of the court below. 253 Fed. 657.

The plaintiff contends that claims 1, 2, 3, and 4 are infringed by defendant's keyless socket, and claims 1 and 4 by defendant's key socket, and, as cross-appellant here, alleges that the court erred in

adjudging claims 2 and 3 invalid, instead of valid and infringed. Each of these claims was held valid and infringed in a suit brought in the Southern district of New York by this plaintiff against National Gas & Electric Fixture Co. (D. C.) 204 Fed. 79, affirmed 212 Fed. 948, 950, —— C. C. A. ——. The defendant contends, however, that in view of the evidence as to the prior art presented in this, but not in the former, case, both claims 2 and 3 are invalid for want of patentable novelty. This new evidence consists, among other things, of British patent to the Edison & Swan Electric Light Co., Ltd., No. 6781 of 1895, British patent to Gover, No. 11,714 of 1897, and United States patent No. 575,322 to Benjamin, dated January 19, 1897. Each of these patents, as does Weber's, pertains to electric lamp sockets. The Edison & Swan patent states:

"The base $A$ is grooved along each side, and the casing $G$ which holds it has its two opposite sides indented as shown at $H$, so that the base $A$ and the parts fixed in it are made to occupy the proper position relatively to the bayonet catch slot $K$ by which the lamp base is held in the socket."

The Gover patent expressly provides:

"The two sides of the socket are indented so as to form internal protuberances $p$ engaging in the grooves $i$ of the insulator to prevent it from turning."

In these two patents the lamp is mounted directly upon the sleeve by means of bayonet slots instead of upon the base by means of the lamp support or screw socket as in Weber's; but in the Benjamin patent the lamp is mounted upon the base by means of a screw socket, the base being inclosed in a case or shell of two parts screwed together. Benjamin describes his means of preventing rotation between the case and base thus:

"Upon the interior of the shell or casing $a$ two lugs or projections $e^2e^2$ are provided, which engage corresponding recesses $a^9a^9$ in the base $a$ to prevent rotation of the base relatively to the casing."

To prevent unscrewing the sleeve and cap when screwing the lamp into or unscrewing it from the screw socket of the base Benjamin placed his projections within the cap instead of within the sleeve. Each of these three patents antedates the Weber invention. The means to prevent relative rotative movement between case and base called for by Weber's claims 2 and 3 consists of a "peripheral recess" in the base and "a sheet metal sleeve having a portion of its wall introverted to occupy said base recess." These claims deal only with means to prevent rotative movement between base and socket, and do not, as do claims 1 and 4, include means to automatically interlock with a snap action when the case members are telescopically joined, thereafter to remain interlocked until released by manually compressing the sleeve. The device described in each of the prior art patents accomplishes the same purpose by substantially the same means operating in substantially the same way as does the introverted portion of the case wall called for by Weber's claims 2 and 3; and this is true whether or not the claims be restricted to the specific device he describes. Consequently these claims lack novelty and fall within the

references to the prior art. We are therefore of the opinion that claims 2 and 3 of the Weber patent cannot be sustained, and that the court below did not err in so holding.

The defendant appellant by its assignments of error alleges that the court below erred in finding claims 1 and 4 valid and infringed. These claims were in issue and sustained in Weber Electric Co. v. National Gas & Electric Fixture Co. (D. C.) 204 Fed. 79, affirmed 212 Fed. 948, 950, —— C. C. A. ——; Weber Electric Co. v. Wirt Mfg. Co. (D. C.) 226 Fed. 481; and Weber Electric Co. v. Cutler-Hammer Mfg. Co. (unreported); affirmed 256 Fed. 31, —— C. C. A. ——. Claim 4 was in issue and sustained in Weber Electric Co. v. Union Electric Co. (D. C.) 226 Fed. 482. In view of these decisions, and because we think the plaintiff has failed to show that the defendant has used the particular devices to which the plaintiff can be considered entitled under these claims, assuming them to be valid, our discussion will be confined to the question of infringement.

Claims 1 and 4 call for "a cap adapted to telescopically receive the slotted end of said sleeve," to which claim 1 adds:

"Said members having interengaging parts *adapted to automatically interlock with a snap action when telescopically applied to each other.*"

And claim 4, after describing the interengaging parts, provides:

"Whereby said members are *adapted to automatically interlock with a snap action when telescopically applied to each other.*"

That the italicized words are words limiting and restricting the claims to such interengaging parts as will automatically interlock with a snap action when telescopically applied to each other is clear. Paper Bag Patent Case, 210 U. S. 405, 410, 28 Sup. Ct. 748, 52 L. Ed. 1122; The Corn Planter Patent, 23 Wall. 181, 218, 219, 23 L. Ed. 161; Dey Time Register Co. v. W. H. Bundy Recording Co. (C. C.) 169 Fed. 807, affirmed 178 Fed. 812, 102 C. C. A. 260; Long v. Pope Manufg. Co., 75 Fed. 835, 839, 21 C. C. A. 533. But the meaning of these words of limitation, and particularly of the words "when telescopically applied," remains to be ascertained. For this purpose resort may be had to the state of the prior art, the file wrapper and contents of the Weber patent in suit, Weber's patent No. 916,812, where the identical words are again used by him, and to the dictionaries.

The incandescent electric lamp socket in most general use before and at the time of Weber's invention was made in two parts, one sleeved over the other and united by a bayonet joint. To form this joint one member had an open end slot, longitudinal for part of its length and transverse the remainder. The other member was provided with a stud which entered and passed down the longitudinal part of the slot as the members were pushed together; then by a rotary movement of one member upon the other the stud entered the transverse part of the slot and locked the two parts, so as to prevent separation by a longitudinal movement. The members were held against reverse lateral motion by friction, or by the tightening of a screw forming the stud in one or more of the bayonet joints.

The chief object of Weber's invention was to provide an automatic

and positive locking connection between the sleeve and cap of the socket. His original application contained eight claims, but, as disclosed by the file wrapper and contents, certain claims were rejected by the patent office on patent to Oetting, No. 642,825, or to Kenney, No. 712,686. The Oetting device, as appears by the specification, was intended to do away with the bayonet joint as a locking means. It substituted therefor spring tongues formed within and as part of the sleeve, and bent flanges or lips on the spring tongues adapted to engage openings or slits in the flange of the cap. The lock so formed was positive in that it required deliberate effort to release it. The parts were adapted to interlock by simply slipping or pushing one within the other as contrasted to the bayonet joint locking movement, but the lock was not automatic, for manual depression of the spring tongues was necessary to permit the flange of the cap to pass over the protruding lips. In Kenney's device the opening in the sleeve consisted of bayonet slots, and bayonet slots with a bridge crossing the transverse portion of the slot at its intersection with the vertical portion, the bridged bayonet slots being designated in the patent as open-end slots and adjacent pockets with a bridge between them.

Radial inwardly projecting studs on the cap were designed to travel vertically in and to the lower end of the open-end slots or gates, thence laterally across the bridge and into the adjacent pockets, while additional radial projections on the cap were traveling in the vertical and transverse portion of the bayonet unbridged slots, and entering recesses within the periphery of the socket base to lock it in position. The radial projection entering the bridge bayonet slot was beveled on each side to permit its passing over the bridge by a lateral or rotary movement in locking and unlocking. Kenney's lock would not operate by the longitudinal assembling of the case members; it required a rotary movement; it was not positive, for it could become unlocked without a deliberate effort to accomplish that purpose, but it was automatic in that it could be locked without separate manipulation of the inter-engaging parts.

After the above-mentioned rejection of claims, the patentee amended his application and filed with the amendments remarks which indicate not only his understanding of the manner in which his device differed from those of Oetting and Kenney, but also his understanding of a "telescopic movement." Concerning his own device he says:

"The parts are permitted to be applied to each other by simply inserting one within the other, without manually compressing the inner member," etc.

As to the Oetting construction he states:

"The parts cannot be locked together by simple telescopic movement; it being necessary to manually depress the catches," etc.

He thus distinguishes from Oetting, not in the direction of the locking movement or in the positiveness of the lock, but in the automatic feature only. In so doing he treats the direction of locking movement as identical and describes it synonymously as "simply inserting one within the other" and as a "simple telescopic movement." Touching the Kenney socket Weber says:

"Kenney's device is adapted to unlock by simply rotating one member upon another in the same manner that the parts are locked together, no manual compression of the inner member being necessary."

Comparing this description with the Weber structure, we find that both locks are automatic; Weber's is positive; Kenney's is not. Weber's locks by "simply inserting one [member] within the other"; Kenney's by "simply rotating one member upon the other." The distinguishing features are the positiveness of the lock and the direction of locking movement. As "simply rotating one member upon another" is not "simply inserting one [member] within the other," it is not the movement described in Weber's remarks as "telescopic." It thus appears that "telescopic movement" is used by the patentee, not to describe a bayonet joint locking movement, but a movement in antithesis thereto. This is confirmed by the patentee's use of the words "when telescopically applied" in his subsequent patent, No. 916,812, which covered a device so constructed as to prevent relative rotary motion of the cap and sleeve both during and after their telescopic application. And we think these words apt and appropriate to define the straight longitudinal movement as distinguished from the bayonet joint movement, for such is their ordinary and usual acceptation.

Hawkins' Mechanical Dictionary, under "Telescopic Pipe Joint" says:

"The telescopic joint permits longitudinal extension and contraction."

The word "telescope" is defined by the Standard Dictionary thus:

"To drive together, so that one slides into another, like the sections of a spyglass or small telescope; to crush by driving together into or upon; to move like the sliding portions of a spyglass in closing."

Lexicographers have so uniformly defined this word that the meaning given by one may be accepted as imparting the thought of all. The verbs in this definition convey the idea of a longitudinal force impelling a direct onward or forward movement in contradistinction to lateral force and rotary motion.

But, even assuming that the words "when telescopically applied" are susceptible of a construction sufficiently broad to include the bayonet joint locking movement, the remarks, filed in the Patent Office by the patentee or on his behalf, distinguishing the Weber locking movement from that of Kenney, disclose that either Weber always intended and understood that these words should bear their usual meaning, and thus exclude the Kenney movement, or under stress of the Patent Office rejection he elected to so restrict their meaning. In either event the result is the same, namely, that having thus limited his claims to exclude the bayonet joint movement of Kenney, he is not now entitled, through the aid of the doctrine of equivalents or otherwise, to a construction that would embrace it.

The direction of the Weber locking movement has been heretofore considered by the courts, not, it is true, in cases in which the members of the socket alleged to be an infringement were adapted to interlock by a bayonet joint movement only, for such device appeared in the history of the Weber litigation for the first time in the court be-

low, but in cases in which the locking parts were adapted to interengage when applied to each other by a single, straight, longitudinal movement. In those cases the courts, construing the claims there in issue, and differentiating the Weber device from those of Kenney and Oetting, have held that the Weber locking movement is a straight longitudinal motion along the axial line of the two members of the socket, and that this constituted a feature distinguishing it from the Kenney device. In the Union Electric Co. Case, Judge Rellstab, referring to the Weber device, said:

"From this recital it will appear that in assembling the members nothing beyond telescopically applied pressure was necessary to effect interlocking."

And as to the Kenney device he said:

"No interlocking of the Kenney members could be effected automatically by telescopic pressure. A rotary movement of the members against each other was absolutely necessary to put the radial projections and the intermediate lugs into position to effect a locking engagement."

Judge Ray, in the National Gas & Electric Fixture Co. Case, referred to the interlocking of the two members of the Weber socket as taking place "as the two are pushed together." Judge Hand, in the Cutler-Hammer Mfg. Co. Case, said:

"I think it is established by the decisions of Judge Ray, Judge Rellstab, and the Circuit Court of Appeals, that the Kenney socket is locked by a rotative movement whereas the Weber socket is locked by a direct longitudinal thrust. * * * Judge Ray * * * said as to the Bray patent, No. 170,-703, that the partial rotation required for disengagement was a distinguishing mark from the mode of operation of the Weber patent."

The Circuit Court of Appeals, in affirming Judge Hand, said:

"The vital point is that Weber's way is to engage by a straight thrust. * * *"

While the dominant feature of Weber's inventive idea may be the interlocking without handling or manipulating the catches as in Oetting, and the positiveness of the lock which requires manual compression of the slotted sleeve to unbolt it, as contended by the plaintiff, yet the protection afforded by the patent is no broader than its claims; and in view of the foregoing considerations we are of the opinion that the words "adapted to automatically interlock with a snap action when telescopically applied to each other," found in claims 1 and 4, limit those claims to such means or members as will so interlock when applied to each other by a straight longitudinal motion along the axial line of the two members of the socket.

As defendant's key and keyless sockets, charged to infringe claims 1 and 4, both lock with the bayonet joint movement and their locking means are not adapted to interlock when the members or means are telescopically applied to each other, we think the charge of infringement cannot be sustained.

The decree of the District Court is accordingly affirmed as to claims 2 and 3, and reversed on the issue of infringement as to claims 1 and 4, with directions to dismiss the bill, with costs to the defendant in this court and the court below.